IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

OCTAGON, INC.,

    Plaintiff,

v.

                         Civil Action No. 01:10-cv-652

SANYA RICHARDS,

    Defendant.

FILED OCT 15 2010 CLERK, U.S. DISTRICT COURT ALEXANDRIA, VIRGINIA

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiff Octagon, Inc's ("Octagon") Motion for Confirmation of an Arbitration Award and Defendant Sanya Richards's Cross-Motion to Vacate the Arbitration Award. Because Defendant has failed to demonstrate conduct by the arbitrator sufficiently egregious to vacate the award under Section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, this Court grants Plaintiff's Motion for Confirmation of an Arbitration Award and denies Defendant's Cross-Motion to Vacate the Arbitration Award.

I.

This Court first notes that it is bound by the facts as found by the arbitrator. "Courts . . . do not sit to hear claims of factual . . . error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes . . . , an arbitrator must find facts and a court may not reject

those findings simply because it disagrees with them." <u>See</u>
<u>United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.</u>, 484
U.S. 29, 39 (1987).

The underlying dispute arises from a contract entered into
during the spring of 2004. Earlier that year, someone from Nike
USA, Inc. ("Nike"), informed Renaldo Nehemiah, an agent employed
by Octagon, that Richards, then a sophomore track star at the
University of Texas at Austin, might be turning professional.
Nehemiah then called Archie Richards, Defendant's father, and
Beverly Kearney, Defendant's coach, to confirm whether this
rumor was true. Nehemiah was then referred to Pamella Watson,
the family's advisor. In a subsequent telephone conversation
with Watson, Nehemiah told Watson that if Defendant were to turn
professional, he would be interested in serving as her agent.

Later, Watson called Nehemiah on several occasions seeking
more information on industry guidelines, fees charged for
services, and other questions about turning professional. This
ultimately led to Watson requesting that Nehemiah meet briefly
with her and Defendant's father. Nehemiah obliged, and they met
in May 2004 in Florida. At that meeting, Nehemiah informed the
Defendant's father and Watson that, if they wanted to select
Nehemiah as Defendant's agent, Defendant would first need to
turn professional in order to avoid any eligibility issues.

On June 16, 2004, a few days after placing third in the women's individual 400 meter race at the NCAA championships, Richards announced at a press conference that she was forgoing her remaining years of NCAA eligibility and turning professional. That same day, Watson telephoned Nehemiah, informing him that Richards had turned professional and that she was selecting Octagon as her agent, subject to a reduced fee of 15%, to which Nehemiah agreed.

On June 17, 2004, Richards, along with her parents, signed the representation agreement ("Octagon Agreement"). Included in the Octagon Agreement were provisions stating that Octagon would serve as Richards's exclusive representative in merchandising activities, such as corporate sponsorships and product endorsements. For these services, the Octagon Agreement further stated that Richards agreed to pay Octagon 15% of all compensation she received "pursuant to any agreement, arrangement, or association, which is entered into, or on which negotiations, substantially commenced, during the term of this Agreement, and any renewal, extension, or modification thereof, regardless of whether such compensation is paid during the term of this Agreement or thereafter."

During the term of the Octagon Agreement, Richards and Nike entered into a track and field endorsement contract ("2004 Nike Contract"). The term of the 2004 Nike Contract lasted from July,

1, 2004 through December 31, 2008. Under this contract, Richards received compensation in the form of, among other things, base compensation, bonuses for race performances, Nike products, and merchandise credit. In 2004 and 2005, Richards paid Octagon fees for the compensation she received under the 2004 Nike Contract.

On January 10, 2006, Richards e-mailed Nehemiah stating that she would not re-sign with Octagon. Nine days later, Richards again e-mailed Nehemiah, stating that she would "honor our contract and pay [Octagon] on time every month." Octagon later became aware that Defendant had attempted to assign the benefits from the Nike Contract from Octagon to Ashar Enterprises, Inc., Richards's new agents (her parents). On March 7, 2006, Octagon informed Richards by letter that "Octagon continues to be entitled to a fee in connection with your Nike contract (and any renewals thereof)."

After deciding not to re-sign with Octagon, Richards honored her contractual obligations and continued to pay Octagon's fees earned under the Nike Contract throughout 2006, the last of which was paid on January 9, 2007. Richards also paid Octagon a fee earned under the Nike Contract on February 21, 2007 for her ranking bonuses that had been invoiced on January 3, 2007.

In early 2007, Richards entered into another agreement with Nike ("2007 Nike Contract"). Richards and Nike modified only two

terms of the 2004 Nike Contract—the compensation and the
expiration date; otherwise, the 2007 Nike Contract and the 2004
Nike Contract were identical. Octagon learned about the 2007
Nike Contract, which prompted Nehemiah to e-mail Defendant's
mother (and now agent) requesting a copy of the 2007 Nike
Contract. In that e-mail, Nehemiah also quoted a portion of the
Octagon Agreement, noting that Defendant owes Octagon fees on
any renewal, extension, or modification of any endorsement
agreement entered into during the term of the Octagon agreement.

Responding to Nehemiah's e-mail, Sharon Richards stated
that "[w]e will continue to pay you what you negotiated for
Sanya and her new increases . . . ." Defendant continued to race
from 2007 and 2009, and was very successful, winning a gold
medal in the 4 x 400 meter relay at the 2007 World
Championships in Athletics in Osaka, Japan, a gold medal in the
4 x 400 meter relay and a bronze medal in the individual 400
meter race at the 2008 Olympic Games in Beijing, and a gold
medal in the 4 x 400 meter relay at the 2009 World Championships
in Athletics in Berlin, Germany. Richards never paid Octagon any
fees for any compensation earned under the 2007 Nike Contract
from 2007 to present.

On September 3, 2007, Octagon filed its demand for
arbitration. Richards filed her answer and affirmative defenses
on November 7, 2007, where she cited the Florida athlete agent

statute as an affirmative defense. Specifically, Defendant stated that "Claimant [Octagon] may not recover against Defendant since the subject agreement was entered into in Florida and Claimant was not licensed pursuant to Fla. Stat. § 468.453. Therefore, the subject contract is void and unenforceable."

Soon after the American Arbitration Association noted the parties' request to mediate the matter, both parties agreed to hold the matter in abeyance in an attempt to settle the dispute. The matter remained in abeyance until August 14, 2009, when Octagon filed an amended demand for arbitration. The parties jointly selected an arbitrator on September 18, 2009 and participated in preliminary hearings on October 14 and December 15, 2009. The hearing on the merits took place on March 17, 2010. Before this hearing commenced, Defendant's counsel indicated that they planned to appeal any adverse award because the AAA did not have jurisdiction over this dispute—i.e., they questioned whether this dispute was arbitrable.

On April 9, 2010, the arbitrator issued an interim award of $264,000 in damages to Octagon. In her written opinion concerning the interim award, the arbitrator determined that "the Florida or Texas statute concerning agents and student athletes is irrelevant to this proceeding. These statutes are both regulatory/criminal in nature and designed to protect the

6

colleges and universities of those respective states as well as the student athlete." The arbitrator further determined that the 2007 Nike Contract both extended and modified the 2004 Nike Contract.

On April 23, 2010, the arbitrator issued a final award further awarding Octagon $13,686.50 in attorney's fees and $2,150 in filing fees, for a total award of $279,836.50. On May 4, 2010, Octagon filed a Motion for Confirmation of an Arbitration Award in the Circuit Court for Fairfax County, pursuant to Va. Code §§ 8.01-581.09 and 8.01-581.013.

On June 11, 2010, Defendant properly removed this action to this Court pursuant to 28 U.S.C. § 1332. On July 9, 2010, Defendant filed a Response in Opposition to Motion to Confirm Arbitration Award and Cross-Motion to Vacate Arbitration Award, arguing that the arbitral award must be vacated because (1) there was no enforceable agreement to arbitrate, meaning that the arbitrator exceeded her power; (2) the award violates the public policy of Texas and Florida; and (3) the arbitrator exceeded her powers and manifestly disregarded the law in issuing the award.

II.

To vacate an arbitration award, as Defendant concedes, the challenging party has an extremely high burden to bear. "Review of an arbitrator's award is severely circumscribed [and] . . .

7

is among the narrowest known at law because to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all—the quick resolution of disputes and the avoidance of the expense and delay associated with litigation." Apex Plumbing Supply, Inc. v. U.S. Supply Co., 142 F.3d 188, 193 (4th Cir. 1998). "Every presumption is in favor of the validity of the award," Richmond, Fredericksburg & Potomac R.R. Co. v. Transportation Communications Int'l Union, 973 F.2d 276, 278 (4th Cir. 1992), and this court cannot reconsider the merits of an award. Misco, 484 U.S. at 45 (1987); United Steelworkers of Am. v. Am. Mfg. Co., 363 U.S. 564, 567-68 (1960). Such "judicial second-guessing . . . would transform a binding process into a purely advisory one, and ultimately impair . . . arbitration . . . . ." Westvaco Corp. v. United Paperworkers Int'l Union, 171 F.3d 971, 974 (4th Cir. 1999), the value of which has long been recognized, see, e.g., Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp, 460 U.S. 1, 24 (1983).

Nevertheless, the FAA, which neither party disputes applies to this agreement, see 9 U.S.C. § 2, enumerates four instances where a court may vacate an award:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). This list provides the exclusive grounds for judicial vacatur of an arbitration award. See Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576, 586–88 (2008). Section 10(a)(4) is the only relevant provision to this dispute.

A.

At the outset, Defendant challenges the award on the ground that the arbitrator exceeded her power. Specifically, Defendant asserts that the arbitration clause in the Octagon Agreement does not state whether the parties agreed to submit to an arbitrator the question of arbitrability of disputes arising under the contract. Because the arbitration clause is unclear, Defendant argues that this Court owes no deference to the arbitrator's determination that this dispute was arbitrable. Because no deference is owed to the arbitrator's determination of arbitrability, under Defendant's reasoning, this Court essentially owes the underlying arbitration no deference.

This Court will assume that the parties agreed to arbitrate the question of arbitrability only where "there is 'clear and

9

unmistakable' evidence that they did so." First Options of

Chicago, Inc. v. Kaplan, 514 U.S. 938, 942 (1995)(quoting AT&T

Technologies, Inc. v. Communications Workers of Am., 475 U.S.

643, 649 (1986)). The relevant clause of the Octagon Agreement

provides:

> [Richards] and Octagon agree to attempt in good faith
> to resolve any claims, disputes, or other matters in
> question arising out of, or in connection with, this
> Agreement or any breach thereof. In the event that
> [Richards] and Octagon are unable to reach an amicable
> settlement, such dispute shall be settled by
> arbitration in accordance with then-existing
> Commercial Arbitration Rules of the American
> Arbitration Association. . . . The award rendered by
> the arbitrators shall be final, not subject to appeal,
> and judgment may be entered upon it in any court
> having jurisdiction.

Thus, the arbitration clause in the Octagon Agreement grants an

arbitrator broad and expansive jurisdiction to hear disputes

related to this contract.

Broad and expansive, however, are not synonymous with "'

clear and unmistakable.'" First Options of Chicago, 514 U.S. at

942 (quoting AT&T Technologies, 475 U.S. at 649). "[B]road

arbitration clauses that generally commit all interpretive

disputes 'relating to' or 'arising out of' the agreement do not

satisfy the clear and unmistakable test." Carson v. Giant Food,

Inc., 175 F.3d 325, 330 (4th Cir. 1999). "[I]f contracting

parties wish to let an arbitrator determine the scope of his own

jurisdiction, they must indicate that intent in a clear and

10

specific manner. Expansive general arbitration clauses will not suffice to force the arbitration of arbitrability disputes." Id. The Octagon Agreement's arbitration clause makes no mention of who—an arbitrator or a court—should determine arbitrability. Thus, without more, this Court cannot assume that the parties agreed to have the arbitrator decide the scope of her own powers.

The "more", Plaintiff argues, is Defendant's conduct during the arbitration. Plaintiff contends that by completing the arbitration process, Defendant manifested an objective intent to arbitrate this dispute, thereby waiving any objection to arbitrability. See Rock-Tenn Co. v. United Paperworkers Intern. Union AFL-CIO, 184 F.3d 330, 334 (4th Cir. 1999) ("[P]arties can manifest their agreement to arbitrate by conduct . . . ."). While Defendant may have participated in the arbitration, Defendant far from acquiesced to the proceeding.

On the contrary, Defendant raised her objection to arbitration both in her Answer to Octagon's Demand for Arbitration and at the outset of the merits hearing. That distinguishes this case from Rock-Tenn Co., where the party challenging arbitrability "utter[ly] fail[ed] during [arbitration] to challenge the arbitrator's authority to determine the dispute, or even preserve the issue for resolution by the court." Id. Defendant therefore did not "'cede[]'

authority to the arbitrator" to decide arbitrability. Id. (citing Richmond, Fredericksburg & Potomac R.R. Co., 973 F.2d at 280); Int'l Chem. Workers Union, Local No. 566 v. Mobay Chem. Corp., 755 F.2d 1107, 1110 (4th Cir. 1985)); see also Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1510 (3d Cir. 1994), aff'd 514 U.S. 938 (1995) ("A jurisdictional objection, once stated, remains preserved for judicial review absent a clear and unequivocal waiver. Therefore, where a party objects to arbitrability, but nevertheless voluntarily participates in the arbitration proceedings, waiver of the challenge to arbitral jurisdiction will not be inferred." (citations omitted)).

Based on the language in the Octagon Agreement and Defendant's conduct during arbitration, this Court cannot assume that the parties intended to submit the question of arbitrability to the arbitrator. Therefore, this Court reviews de novo the question of arbitrability. See First Options of Chicago, 514 U.S. at 947.

Determining the arbitrability of a dispute requires a two-step analysis: 1) whether the parties have a valid arbitration agreement, and, if so, (2) whether that agreement applies to the subject matter before the court. See id. at 943-46; AT&T Technologies, 475 U.S. at 651-52. Moreover, "any doubts concerning the scope of arbitral issues should be resolved in

12

favor of arbitration." Mitsubishi Motors Corp. v. Soler
Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985).

Regarding the first step of the analysis, Defendant
contends that there was no valid agreement to arbitrate because
the Octagon Agreement was void ab initio. Texas and Florida law
generally require that an athlete agent be registered or
licensed with the state before serving in that capacity within
their respective borders. See Tex. Occ. Code Ann. §§
2051.101(a); Fl. Stat. § 468.453. Because Nehemiah was not
licensed under Texas and Florida law when Richards entered into
the Octagon Agreement, defendant asserts that the contract was
void. See Tex. § 2051.101(c); Fl. Stat. § 468.454. Therefore,
according to Defendant, the arbitration clause therein is
invalid.

Defendant is mistaken—the validity of the entire contract,
does not, ipso facto, determine the validity of the arbitration
clause. Rather, "an arbitration provision is severable from the
remainder of the contract." Buckeye Check Cashing, Inc. v.
Cardegna, 546 U.S. 440, 445 (2006) (rejecting the proposition
that the enforceability of an arbitration clause within a
contract depends upon state public policy and contract law).
Thus, whether the Octagon Agreement itself is valid plays no

part in this Court's determination of the arbitration clause's validity.[1]

The Buckeye respondents asserted very similar arguments to those that Defendant asserts here. There, respondents argued that because an agreement void ab initio under Florida law is not a contract, and that agreement contained an arbitration clause, there was no valid arbitration agreement to which Section 2 the FAA, 9 U.S.C. § 2, could apply to compel arbitration of the relevant dispute. See id. at 447. The Supreme Court rejected this argument, holding that "contract" as used in Section 2 "include[s] contracts that later prove to be void." Id. at 448. Writing for the Court, Justice Scalia explained the ostensibly fallacious result of such reasoning:

> [While] the Prima Paint rule permits a court to
> enforce an arbitration agreement in a contract that
> the arbitrator later finds to be void, . . . it is
> equally true that respondents' approach permits a
> court to deny effect to an arbitration provision in a

---

[1] Defendant wrongly asserts that because the validity of the Octagon Agreement is in question, that is an issue of contract formation, which lies within this Court's jurisdiction. Granite Rock Co. v. Int'l Bros. of Teamsters, __ U.S. __, 130 S. Ct. 2847, 2856-57 (2010) ("[W]here the dispute at issue concerns contract formation, the dispute is generally for courts to decide.") (citations omitted). While it is true that a contract's validity is dependent upon its formation, those two concepts are distinct. "The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and oblige was ever concluded." Buckeye Check Cashing, 546 U.S. at 444 n.1 (discussing examples of contract formation issues, including whether the parties ever signed the contract or whether the signor lacked the mental capacity to assent) (citations omitted).

14

contract that the court later finds to be perfectly
enforceable. Prima Paint resolved this conundrum—and
resolved it in favor of the separate enforceability of
arbitration provisions.

Id. at 449; see also Prima Paint Corp. v. Flood & Conklin Mfg.
Co., 388 U.S. 395, 402-03 (1967). Here, Defendant has not
demonstrated that the arbitration clause contained within the
Octagon Agreement is independently invalid.

Indeed, the arbitration clause within the Octagon Agreement
is essentially a separate contract within a contract. While
Defendant has attacked the Octagon Agreement as void ab initio,
she has failed to mention "any grounds that exist at law or in
equity for the revocation of any contract," 9 U.S.C. § 2, that
would cause this Court to question the validity of the contract
most relevant to this proceeding: the arbitration clause itself.
Defendant's tactic makes sense, as "the claimed basis of
invalidity for the contract as a whole will be much easier to
establish than the same basis as applied only to the severable
agreement to arbitrate." Rent-A-Center, West, Inc. v. Jackson,
__ U.S. __, 130 S. Ct. 2772, 2779 (2010). This Court finds that
the arbitration clause within the Octagon Agreement was valid.

The second step of the analysis—whether the valid
arbitration clause covered the dispute over Octagon's
entitlement to fees from Richards's 2007 Nike Contract—is much
more straightforward. This dispute falls within the scope of the

15

arbitration clause, as it is a "claim[], dispute[], or other matter[] in question arising out of, or in connection with, this Agreement or any breach thereof." In short, resolution by arbitration of this dispute is exactly what both parties bargained for.

Because the valid arbitration clause contained in the Octagon Agreement covered this dispute, this Court finds that the matter was arbitrable. Because the dispute was of the type contemplated by both parties to be submitted to arbitration, the arbitrator did not exceed her powers. Therefore, this Court will not exceed its powers and cannot vacate the resulting award on this ground.

B.

Defendant next contends that the arbitration award must be set aside because it is contrary to Texas's and Florida's public policy. Specifically, Defendant argues that the award violates both states' policy of protecting student athletes and their schools from professional athlete agents who solicit them to turn professional, asserting this policy is evidenced by the agent licensing laws of both states.

Rooted in the "general doctrine . . . that a court may refuse to enforce contracts that violate law or public policy," Misco, 484 U.S. at 42, a court may vacate an arbitration award only when (1) the public policy is "well defined and dominant,

as ascertained by references to the laws and legal precedents and not from general considerations of supposed public interests," and (2) the award itself is a clear violation of public policy. W.R. Grace & Co. v. Local Union 759, International Union of the United Rubber, Cork, Linoleum & Plastic Workers, 461 U.S. 757, 766 (1983); Misco, 484 U.S. at 43.

It should be noted, however, that the viability of the public policy ground for vacatur is currently in question in this circuit in the wake of Hall Street Associates, Inc. See MCI Constructors, Inc. v. City of Greensboro, 610 F.3d 849, 857 n.5 (4th Cir. 2010); Raymond James Fin. Services Inc. v. Bishop, 596 F.3d 183, 193 n.13 (4th Cir. 2010). As discussed supra, in Hall Street Associates, Inc., the Supreme Court held that Section 10(a)(4) provides the exclusive grounds for a court to vacate an arbitration award. District courts within this circuit have reached different conclusions about the availability of common law grounds for vacating an arbitral award in the wake of Hall Street Associates, Inc. Compare, e.g., MCI Constructors, Inc. v. Hazen & Sawyer, P.C., No. 02CV396, 2009 U.S. Dist. LEXIS 17866, at *35-37 (M.D.N.C. Mar. 9, 2009), aff'd 610 F.3d 849 (4th Cir. 2010), with D.N. Betters Drywall, Inc. v. Wirth Dev. Corp., No. 2:09cv246 (E.D. Va. Aug 28, 2009). Here, this Court assumes,

without deciding, that public policy remains a viable ground for judicial vacatur of an arbitration award.

Defendant's assertion that this Court must vacate the arbitration award in favor of Octagon rests on two assumptions. Defendant assumes that (1) Texas and Florida's public policies are relevant to this dispute; and (2) that the Octagon Agreement violates those states' respective laws regarding student athletes and athlete agents. Regarding the first assumption, Octagon does not dispute before the Court that Texas and Florida are the states whose public policies are relevant to this matter. Therefore, for its analysis, this Court will assume that those are the states to which it should look for public policy grounds, if any, to vacate this award.

Defendant's second assumption, that the Octagon Agreement violated Texas and Florida law, was rejected by the arbitrator as stated in her interim award—"the Florida or Texas statute concerning agents and student athletes is irrelevant to this proceeding. These statutes are both regulatory/criminal in nature and designed to protect the colleges and universities of those respective states as well as the student athlete." Nevertheless, Defendant points to these same statutes as evidence that the arbitral award itself violates Texas and Florida public policy.

18

That, of course, assumes that the Octagon Agreement violated Texas and Florida laws, and a court's "refusal to enforce an award must rest on more than speculation or assumption." Misco, 484 U.S. at 44. As evidenced by both parties' post-hearing briefs submitted during arbitration, this issue was fully litigated in that proceeding. Setting aside the award on this ground would serve to circumvent the limits of severely circumscribed judicial review of arbitration proceedings that are imposed by the FAA and the Supreme Court. This Court is especially reticent to vacate an award based on the purported invalidity of a contract, an issue that rests solely within the arbitrator's jurisdiction. See Buckeye Check Cashing, 546 U.S. at 445-46. The award here reflects the arbitrator's decision that the laws of Texas and Florida were not violated because they did not apply to this dispute. The arbitrator was "free to reach this conclusion, and having done so, [her] award does not conflict with any established public policy." Remmey v. PaineWebber, Inc., 32 F.3d 143, 150 (4th Cir. 1994).

The public policy ground for overturning arbitration awards is a "two-edged sword," and the countervailing public policy favoring the enforcement of arbitral decisions must be balanced against the public policy that the award is allegedly violating. Westvaco, 171 F.3d at 977-78. Consequently, Defendant has not

19

met the heavy burden required to vacate an award on these grounds. This is not one of the rare instances where this Court will vacate an arbitration award based on public policy.

C.

Defendant argues that this Court has a third ground for vacating the arbitration award—that the arbitrator manifestly disregarded the law of Texas and Florida. By finding the Texas and Florida athlete agent statutes irrelevant to the dispute, Defendant contends the arbitrator exceeded her powers.

Just as the viability of the public policy ground for setting aside an arbitration award is currently in question, this Court notes that the viability of "manifest disregard of the law" as an independent ground for vacatur is also in doubt. See Hall Street Associates, 552 U.S. at 584. Nevertheless, several courts have held that manifest disregard of the law remains a ground for vacating an award when that phrase is used as shorthand for the grounds enumerated in Section 10(a)(4) of the FAA. See Stolt-Nielsen SA v. Animal Feeds Int'l Corp., 548 F.3d 85, 93-95 (2d Cir. 2008), rev'd on other grounds, 130 S. Ct. 1758 (2010); Comedy Club, Inc. v. ImprovWest Associates, 553 F.3d 1277, 1290 (9th Cir. 2009) ("we conclude that manifest disregard of the law remains a valid ground for vacatur because it is part of § 10(a)(4)."); Coffee Beanery, Ltd. v. WW, L.L.C., 300 Fed. Appx. 415, 418-21 (6th Cir. 2008). The Fourth Circuit

has not ruled on this issue. See MCI Constructors, 610 F.3d at

857 n.5; Raymond James Fin. Services Inc., 596 F.3d 183 at n.13.

For the sake of this Court's analysis today, it assumes, without

deciding, that an arbitration award may be set aside on public

policy grounds in the wake of Hall Street Associates.

That assumption, however, is of no help to Defendant here.

No matter how construed, manifest disregard of the law is

perhaps the most arduous path to seek vacatur of an arbitration

award. Defendant must show that the arbitrator "was aware of the

law, understood it correctly, found it applicable to the case

before [her], and yet chose to ignore it in propounding [her]

decision." Remmey, 32 F.3d at 149 (citing Nat'l Wrecking Co. v.

Int'l Bros. of Teamsters, Local 731, 990 F.2d 957, 961 (7th Cir.

1993)). "So long as an arbitrator makes a good faith effort to

apply the law as [she] perceives it, the courts may not upset

[her] decision simply because they are able to poke a few holes

in the arbitrator's analysis." Richmond, Fredericksburg, &

Potomac R.R. Co., 973 F.2d at 281. This court "is limited to

determining 'whether the arbitrators did the job they were told

to do—not whether they did it well, or correctly, or reasonably,

but simply whether they did it." Remmey, 32 F.3d at 146 (quoting

Richmond, Fredericksburg & Potomac R.R. Co., 973 F.2d at 281).

Defendant equates the arbitrator's finding laws

inapplicable to a dispute with a manifest disregard of the law.

21

Remmey, however, makes it clear that manifest disregard of the law requires a finding that laws are applicable to case, but the arbitrator nevertheless chose to ignore them. Id. at 149. Here, the arbitrator did not disregard the law, but instead, considered the applicability of the Texas and Florida statutes to the facts of the case before her. After considering the evidence and testimony submitted by both parties, the arbitrator agreed with Octagon's argument that the statutes were inapplicable and rendered an award in favor of Octagon.

Moreover, whether or not the arbitrator made an error of law as to the applicability of the Florida and Texas statutes and the validity of the Octagon Agreement is irrelevant to this Court's inquiry, as an error of law is not a sufficient ground to overturn an arbitration award. Apex Plumbing Supply, 142 F.3d at 195. "An arbitrator does not act in manifest disregard of the law unless: '(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrator[] refused to heed the legal principle.'" Long John Silver's Restaurants, Inc. v. Cole, 514 F.3d 345, 349-50 (4th Cir. 2008) (quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros, 70 F.3d 418, 421 (6th Cir. 1995)). The arbitrator's conduct simply does not rise to the level necessary for this Court to have the authority to vacate her award. "The statutory grounds for vacatur permit challenges on sufficiently improper

conduct in the course of the proceedings; they do not permit
rejection of an arbitral award based on disagreement with the
particular result the arbitrators reached." Remmey, 32 F.3d at
146. Here, Defendant has failed to prove anything beyond an
unfavorable result.

                              III.

     "'Arbitrators do not act as junior varsity trial courts
where subsequent appellate review is readily available to the
losing party.'" Id. (citing Nat'l Wrecking Co., 990 F.2d at
960). Rather, it is this Court that must sit this one out on the
bench.

     For the forgoing reasons, the arbitration award should be
confirmed. An appropriate order shall issue.


                                   _____/s/_____
                                   Claude M. Hilton
                                   United States District Judge


Alexandria, Virginia
October _5_, 2010